IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SPRINT COMMUNICATIONS COMPANY
L.P.,

        Plaintiff,

    v.

COMCAST IP HOLDINGS, LLC, et al.,

        Defendants.

Civil Action No. 12-1013-RGA

## MEMORANDUM OPINION

Richard K. Herrmann, Esq., Mary B. Matterer, Esq., MORRIS JAMES LLP, Wilmington, DE;
B. Trent Webb, Esq., Peter Strand, Esq., John Garretson, Esq. (argued), Aaron Hankel, Esq.,
Ryan Schletzbaum, Esq., SHOOK, HARDY & BACON LLP, Kansas City, MO; Robert Reckers,
Esq., David Morehan, Esq., Jared Tong, Esq., SHOOK, HARDY & BACON LLP, Houston, TX.

Attorneys for Plaintiff Sprint Communications Company, L.P.

Arthur G. Connolly, III, Esq., Ryan P. Newell, Esq., CONNOLLY GALLAGHER LLP,
Wilmington, DE; Matthew B. Lehr, Esq. (argued), Anthony I. Fenwick, Esq. (argued), David J.
Lisson, Esq., Micah G. Block, Esq., Alyse L. Katz, Esq., DAVIS POLK & WARDWELL LLP,
Menlo Park, CA; Michael L. Brody, Esq. (argued), WINSTON & STRAWN LLP, Chicago, IL;
Krishnan Padmanabhan, Esq., WINSTON & STRAWN LLP, New York, NY.

Attorneys for Defendants Comcast IP Holdings, LLC, et al.

August __7__, 2015

ANDREWS, U.S. DISTRICT JUDGE:

Currently pending before the Court are various post-trial motions. Comcast filed a motion for post-trial relief on March 6, 2015, seeking judgment as a matter of law (JMOL) of non-infringement, and in the alternative, a new trial on the issues of infringement and damages. (D.I. 289). Sprint filed a motion for prejudgment and post-judgment interest the same day. (D.I. 285). The matters were fully briefed (D.I. 286, 290, 296, 299, 307 & 309), and oral argument was held on June 25, 2015. (D.I. 313). For the reasons presented below, Comcast's motion for JMOL is granted with respect to non-infringement of all the asserted claims for all the accused Comcast networks. In the alternative, Comcast's motion for a new trial is granted on the issue of infringement. In light of this decision, Sprint's motion for prejudgment and post-judgment interest is dismissed as moot.

I.    BACKGROUND

Both parties in this case are major players in the telecommunications industry. The claimed invention involves "stacking" Synchronous Optical Network (SONET) systems. Sprint filed the complaint in the present case on August 28, 2012, alleging infringement of multiple patents, including U.S. Patent Nos. 5,742,605 ("the '605 patent") and 6,108,339 ("the '339 patent").[1] (D.I. 18). The Court issued a claim construction order on February 4, 2014. (D.I. 119). Comcast filed a motion for summary judgment of non-infringement on October 6, 2014 (D.I. 167), and the Court held oral argument on January 26, 2015. (D.I. 239). The Court denied Comcast's motion for summary judgment, finding "a genuine issue of disputed material fact as to whether an 'interface card' constitutes a 'ring terminal.'" (D.I. 252 at 3).

---

[1] The '605 and '339 patents have the same specification. Unless otherwise noted, all citations to the specification are to the '605 patent.

The Court held a four-day jury trial beginning on February 6, 2015. (D.I. 265, 266, 267 & 268). At trial, Sprint asserted independent claim 1 of the '605 patent, along with independent claims 1 and 17 and dependent claims 7 and 22 of the '339 patent. (D.I. 265 at 139:12–15). After Sprint's case in chief, Comcast moved for JMOL with regard to infringement and damages (D.I. 267 at 865:4–7), and filed a written motion for JMOL the same day. (D.I. 262). Comcast renewed its motion for JMOL at the conclusion of its case. (D.I. 268 at 1186:21–24). I took the matter under advisement. The jury returned a verdict in favor of Sprint, finding that the accused Comcast networks in every region infringed all five of the asserted claims of the '605 and '339 patents, and awarded Sprint $27.6 million in damages. (D.I. 272). The Court entered judgment the same day. (D.I. 273). On March 6, 2015, the parties submitted post-trial motions. Sprint moved for prejudgment and post-judgment interest (D.I. 285), and Comcast moved for JMOL of non-infringement, and alternatively, for a new trial on the issues of infringement and damages. (D.I. 289). Each of these motions will be addressed in turn.

## II. LEGAL STANDARD

### A. Judgment as a Matter of Law

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. Fed. R. Civ. P. 50(a)(1). "Entry of judgment as a matter of law is a 'sparingly' invoked remedy, 'granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'" *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (citation omitted).

"To prevail on a renewed motion for JMOL following a jury trial, a party must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (alterations in original) (internal quotation marks omitted). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

In assessing the sufficiency of the evidence, the Court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor and, in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991). The Court may "not determine the credibility of the witnesses [nor] substitute its choice for that of the jury between conflicting elements in the evidence." *Perkin-Elmer*, 732 F.2d at 893. Rather, the Court must determine whether the evidence supports the jury's verdict. *See Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998); *Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995) (describing standard as "whether there is evidence upon which a reasonable jury could properly have found its verdict"); 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2524 (3d ed. 2008) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury might reasonably find a verdict for that party.").

## B. New Trial

Rule 59(a)(1)(A) of the Federal Rules of Civil Procedure provides, in pertinent part: "The court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59. Among the most common reasons for granting a new trial are: (1) the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) newly discovered evidence exists that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent. *See Zarow-Smith v. N.J. Transit Rail Operations, Inc.*, 953 F. Supp. 581, 584–85 (D.N.J. 1997).

The decision to grant or deny a new trial is committed to the sound discretion of the district court. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282, 289 (3d Cir. 1993) (reviewing district court's grant or denial of new trial motion under "abuse of discretion" standard). Although the standard for granting a new trial is less rigorous than the standard for granting judgment as a matter of law— in that the Court need not view the evidence in the light most favorable to the verdict winner—a new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand," the verdict "cries out to be overturned," or where the verdict "shocks [the] conscience." *Williamson*, 926 F.2d at 1352–53.

## III. DISCUSSION

### A. Comcast's Motion for Judgment as a Matter of Law

Comcast moves for judgment as a matter of law on the issue of infringement. (D.I. 289). Comcast argues that "the undisputed evidence confirms that Comcast's shared SONET platforms do not and cannot contain multiple, unique ring terminals—and thus do not infringe the asserted patent claims." (D.I. 290 at 10). Further, Comcast argues that Sprint has failed to prove that the accused networks have "connections" that are "operational to provide interconnectivity" or a "connection system" "configured to groom SONET traffic." (*Id.* at 10–11 & n.3). Comcast also argues that Sprint misled the jury by making arguments during closing that contradicted the Court's claim constructions. (*Id.* at 11). This argument, however, does not provide grounds for judgment as a matter of law. In Comcast's reply brief, Comcast argues that Sprint's misleading statements were "prejudicial" and made trial "unfair." (D.I. 307 at 16). Thus, I will address Comcast's misleading the jury argument as one for a new trial.

### 1. Infringement Standard

"Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device." *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). If an accused product does not infringe an independent claim, it also does not infringe any claim depending thereon. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989). However, "[o]ne may infringe an independent claim and not infringe a claim dependent on that claim." *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) (internal quotation marks omitted). The patent owner has the burden of proving infringement

and must meet its burden by a preponderance of the evidence. *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

### 2. Analysis

#### a. Whether a Combination of Interface Cards Is a "Ring Terminal"

Comcast argues that neither a single interface card nor a combination of interface cards is a "ring terminal" under the Court's construction. (D.I. 290 at 14–15). During oral argument, Sprint conceded that "[f]or the accused products, a single interface card is not the ring terminal and was never argued to be the ring terminal." (D.I. 313 at 92:11–14). Therefore, I will accept, for purposes of this motion, that a single interface card is not a "ring terminal." Claim 1 of the '605 patent requires "a plurality of rings wherein each ring is comprised of unique ring terminals and spans and is not comprised of any ring terminals and spans of another ring." (D.I. 291-1 at 8:40–44). Similarly, claims 1, 7, 17, and 22 of the '339 patent require "a second SONET ring . . . that does not share ring terminals or ring spans with the first SONET ring." (D.I. 291-2 at 8:43–46 & 9:34–37). The Court construed the term "ring terminal[s]" to mean "a network element that includes a SONET add/drop mux (ADM) and is capable of receiving, switching, grooming, and transmitting SONET traffic on the connected SONET spans." (D.I. 119 at 2). Sprint's expert, Dr. Alan Willner, conceded that under the Court's construction, "a single network element must perform the functions" of a "ring terminal." (D.I. 266 at 670:4–5). Dr. Willner explained that "ring terminals" are "unique" when "no two rings can share the same ring terminal," and that "the grooming, switching, transmitting, [and] receiving of the ADM . . . have to be unique to one ring." (*Id.* at 626:4–17).

Sprint argues that it presented sufficient evidence at trial for a jury to find that "the interface cards of the accused SONET platforms were unique ring terminals." (D.I. 299 at 12).

6

Sprint relies almost entirely on Dr. Willner's testimony for this proposition. Dr. Willner identified "plug-in cards" as "[t]he unique ring terminals" in the accused networks, describing them as "[t]he network elements . . . that provide the various functions" required by the Court's construction. (D.I. 266 at 448:20–24). Sprint notes that Dr. Willner used the Fujitsu Flashwave 4300 and 4500 platforms from the accused Atlanta networks and the Fujitsu FLM 2400 platform from the accused Boston networks as "exemplary implementations" for his infringement analysis.[2] (D.I. 299 at 12–13; D.I. 266 at 440:23–441:5, 443:21–444:8, 444:17–21 & 464:15–465:9). Dr. Willner explained that "within [the Flashwave 4300 and DDM-2000] platforms, there are various plug-in cards, and they're called by different names, interface cards, plug-in cards, cards, and those cards have different functions for different things." (D.I. 266 at 444:10–21). Sprint highlights Dr. Willner's testimony that an "OC-12 plug-in unit" in the Flashwave 4300 includes an "add/drop mux" that performs all the functions of a "ring terminal." (*Id.* at 459:2–6). Sprint has since conceded, however, that a single interface card is not a "ring terminal." (D.I. 313 at 92:11–14).

Sprint also argues that Dr. Willner identified multiple interface cards operating together as a "ring terminal," explaining that at "certain times it's two cards" and "certain times it's three cards." (D.I. 266 at 646:1–5). Both parties' experts agree that a combination of interface cards can perform the "receiving" and "transmitting" functions of a "ring terminal." Dr. Willner explained that in the Flashwave 4300, two OC-12 interface cards work together to perform "receiving and transmitting." (*Id.* at 459:21–460:5; PTX631). Further, he explained that in the Fujitsu FLM 2400, "one of the cards on the left and the right are transmitters and receivers, so

---

[2] Dr. Willner identified the following SONET platforms for each accused region: Atlanta: Flashwave 4100, 4300, and 4500, and DDM-2000 (D.I. 266 at 443:1–447:13); Baltimore: Nortel TBM, Ciena OME 3500 and 6500, and Flashwave 4500; Boston: Flashwave 2400 and 4500, and FLM 150; Chicago: Flashwave 4100 and 4500; Denver: Alcatel 1603 SMX; Philadelphia: Fujitsu FLM 2400, Ciena OME 3500, and Connect DX; Portland: Flashwave 4500; San Francisco: FLM 2400 and Flashwave 4500; and Seattle: Ciena ONS 15454. (*Id.* at 460:24–464:5).

it's [] transmitting/receiving," and "the multiplexer unit does the grooming, and all three together are doing transmitting, receiving, switching and grooming." (D.I. 266 at 464:8–24; PTX658). In the Flashwave 4500, Dr. Willner explained that two cards act "in tandem" to perform the functions of a "ring terminal," and that "each of those cards separately is receiving from one side and going back to the same side." (D.I. 266 at 644:24–645:5; PTX668). Comcast's expert, Dr. Paul Prucnal, expressed a similar understanding of OC-12 cards in the Flashwave 4500, explaining that "the optical signal comes into the receiver on one card, goes through the switch fabric and goes out the transmitter on the other card." (D.I. 267 at 973:17–20). Thus, it is undisputed that a combination of interface cards can "receive" and "transmit" SONET traffic.

Comcast argues, however, that interface cards alone are not "ring terminals" because they do not include "a SONET add/drop mux (ADM)" and do not perform "switching" and "grooming," as required by the Court's construction. (D.I. 290 at 15). Comcast points out that Dr. Willner conceded that the functional description of an OC-12 interface card from the Flashwave 4500 manual describes a "receive function" where the interface card receives optical traffic, converts that traffic into electrical signals, and routes the electrical signals "to the switch fabric plug-in unit," and a "transmit function" that occurs through the same "switch fabric plug-in unit." (D.I. 266 at 659:7–660:23; PTX668 at pp. 9-49 to 9-50). Dr. Prucnal confirmed that the functional description of an OC-12 card from the Flashwave 4500 manual lists three functions: "receive, transmit and loopback," concluding that OC-12 cards in a Flashwave 4500 "receive and transmit," but "do not add/drop, switch or groom." (D.I. 267 at 982:3–24; PTX668 at pp. 9-49 to 9-50). Dr. Prucnal also addressed the description of an OC-12 card in the Flashwave 4300 manual, explaining that "on the receiver side," an optical signal goes into the interface card, where it is "convert[ed] into an electrical signal" and separated "into lower rate signals," which

are then "sent into the switch fabric." (D.I. 267 at 974:12–975:11; PTX631 at p. 12-33). Dr. Prucnal explained that "on the transmit side . . . these signals that are going to be transmitted go through the switch fabric. They end up at this card. And then they can convert it into an optical signal to go out." (D.I. 267 at 976:3–16; PTX631 at p. 12-33). Dr. Prucnal further simplified the description, explaining that "signals are coming from a receiver line card through the switch fabric and out into a transmitter on the other side." (D.I. 267 at 976:7–16).

Comcast also points to the testimony of its engineer, Mr. Davis Johnson, who discussed the Flashwave 4500 platforms used in Chicago networks 1 and 2. Mr. Johnson stated that the Flashwave 4500 platforms only include one SONET add/drop multiplexer because "[t]he add/drop function in a 4500 is implemented by a single switch fabric complex," and "the switch fabric is coming to the entire machine." (*Id.* at 891:24–892:5). He made clear that it is not "possible for the Flashwave 4500 to do add/drop multiplexing without using the switch fabric" (*id.* at 892:6–9), and that it is not "possible for the Flashwave 4500 to contain separate switch fabrics dedicated to individual SONET rings." (*Id.* at 892:16–19). Mr. Johnson further stated that it is not possible for the Flashwave 4500 "to groom SONET traffic without the common switch fabric." (*Id.* at 893:3–6). He explained that an interface card for the Flashwave 4500 could not include a "SONET add/drop multiplexer" or "groom SONET traffic" because the "add/drop" and "grooming" functions are provided by the switch fabric. (*Id.* at 893:23–894:14). Comcast also highlights the testimony of another Comcast engineer, Mr. James McCurdy, who discussed the Flashwave 4300 platforms used in the Atlanta networks. Mr. McCurdy explained that SONET traffic comes in the Flashwave 4300 on an interface card, travels through a switch fabric card, and then travels back out a second interface card. (*Id.* at 906:22–907:9). He further

explained that the switch fabric card is shared by all the SONET rings connected to the Flashwave 4300. (*Id.* at 907:13–16).

Comcast further notes that Dr. Prucnal corroborated the statements of Mr. Johnson and Mr. McCurdy, agreeing that the Flashwave 4300 and 4500 require a "common switch fabric" to perform the functions of "switching, grooming and add/drop multiplexing," and that these functions could not happen on an interface card. (*Id.* at 967:11–968:9). Dr. Prucnal highlighted the Flashwave 4300 manual, which states that the "primary function" of the "[switch fabric plug-in unit] is the switching of all incoming STSs from the transport section," explaining that "STSs are the electrical SONET signals that are coming out of the line card, or going into the line card." (*Id.* at 978:21–979:16; PTX631 at p. 12-9). Dr. Prucnal explained that the Flashwave 4300 manual states that the "switch fabric plug-in unit" is "mandatory" in all Flashwave 4300 configurations, and concluded that "[e]very Flashwave 4300 multiplexer box must have at least one switch fabric in it." (D.I. 267 at 978:5–20; PTX631 at p. 12-9). Sprint, on the other hand, argues that Dr. Willner "explained that the SONET platforms were capable of grooming and switching at multiple locations." (D.I. 299 at 14). Sprint cites Dr. Willner's testimony explaining that "grooming" and "switching" are "broad term[s]" that "can take many different examples" and "occur different ways." (D.I. 266 at 453:20–23 & 456:16–18). Sprint also points out that, when discussing Figure 5 of the patents, Dr. Willner explained that the "three unique ring terminals" are connected to "a shared connection system," which is "doing its own grooming and switching separate from the grooming and switching that's individually done uniquely in those ring terminals." (*Id.* at 524:12–525:9; D.I. 291-1 at 7 fig.5). When discussing "switching functionality" in the Flashwave 2400 and OME 3500, Dr. Willner stated that

"grooming . . . can be done at different places," and "[h]ere it would be done in the connection system whereas other grooming would be done in the ring terminal itself." (D.I. 266 at 565:5–9).

Viewing the evidence in the light most favorable to Sprint, I find that a reasonable jury could not have concluded that a combination of interface cards meets the Court's construction of "ring terminal." The Supreme Court has made clear that "[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). Here, the testimony of both parties' experts, the functional documents of the representative SONET platforms, and the testimony of Comcast's engineers make clear that interface cards alone cannot "add/drop multiplex," "switch," or "groom" SONET traffic. Dr. Willner's statements alleging that interface cards in the representative platforms can perform all the functions of a "ring terminal" are directly contradicted by the platform manuals. Further, Dr. Willner conceded that the Flashwave 4500 manual states that the "receive" and "transmit" functions performed by OC-12 cards require the use of a "switch fabric plug-in unit." Additionally, the Flashwave 4300 manual states that a "switch fabric plug-in unit" is "mandatory" in all configurations, and that its "primary function" is "switching." Thus, it is undisputed that interface cards cannot perform all the functions of a "ring terminal" without the use of a "switch fabric." Therefore, a combination of interface cards, alone, cannot be a "ring terminal" under the Court's construction.

    **b.  Whether the "Ring Terminals" in the Accused Networks Are "Unique" and "Not Share[d]"**

Although Sprint has failed to prove that a combination of interface cards is a "ring terminal" under the Court's construction, Comcast concedes that the SONET platforms that house these interface cards are "ring terminals." (D.I. 290 at 18). Comcast argues, however, that

Sprint's infringement theory fails as a matter of law because the majority of the accused networks share SONET platforms among multiple rings. (*Id.*). Claim 1 of the '605 patent requires "unique ring terminals" (D.I. 291-1 at 8:40–44), while claims 1, 7, 17, and 22 of the '339 patent require that the two rings do "not share ring terminals." (D.I. 291-2 at 8:43–46 & 9:34–27). Comcast notes that Sprint's expert, Dr. Willner, conceded that for the representative Boston region, "there is a plurality of connections . . . that is enabled by the [Flashwave] 4500." (D.I. 266 at 528:13–22). Dr. Willner further stated that for the Boston networks, "two rings could be connected within that platform on two different unique-ring-terminal-type parts." (*Id.* at 530:4–22). Based on this testimony, it is undisputed that multiple rings are connected to individual SONET platforms in the representative networks.

Comcast also notes that Dr. Willner testified that he found "switching functionality" in all the accused regions. (*Id.* at 539:16–17). When discussing "switching functionality" for the representative Boston networks, Dr. Willner cited the Flashwave 4500 manual, explaining that "there is this digital cross-connect . . . that's on this Flashwave unit, which is separate from . . . the card that would be the ring terminal card." (*Id.* at 528:23–529:9; PTX668 at p. 3-78). The Flashwave 4500 manual further states that "[n]on-blocking grooming can be performed through the centralized STS switch fabric," allowing the Flashwave 4500 to "function as a mini-digital cross-connect system (DCS)." (D.I. 266 at 529:12–21; PTX668 at p. 3-78). Comcast's engineers testified that the Flashwave 4500 cannot "contain separate switch fabrics dedicated to individual SONET rings" (D.I. 267 at 892:16–19), and that all the SONET rings connected to the Flashwave 4300 must share a single switch fabric. (*Id.* at 907:13–16). Dr. Prucnal corroborated this testimony, concluding that the representative SONET platforms require a "common switch fabric" to perform the functions of a "ring terminal." (*Id.* at 967:11–968:9). Sprint appears to

concede this point in its briefing, stating that: "The fact that traffic may traverse a shared component—or that grooming and switching may occur on the shared component—does not negate the uniqueness of the interface cards or their unique performance of certain functionality." (D.I. 299 at 14). While it is true that interface cards may perform "certain" functions within a platform, the evidence makes clear that they do not perform all the functions of a "ring terminal." As stated above, the manuals for the representative platforms explain that a "switch fabric plug-in unit" performs both "switching" and "grooming" for the platform. Further, Sprint's expert conceded that the interface cards in the representative platforms must "send" and "receive" SONET traffic to and from a "switch fabric" in order to perform the "receiving" and "transmitting" functions. Dr. Willner also conceded that the platforms enable "a plurality of connections" between the rings in the representative networks. Thus, it is undisputed that SONET platforms in the representative networks perform "switching" and "grooming" for multiple rings through a "common switch fabric" that is shared by those rings.

Comcast argues that SONET platforms are the only possible "ring terminals" in the accused networks because a "common switch fabric" is "mandatory" in each platform and allows the platform to perform all the functions of a "ring terminal." (D.I. 290 at 19). Additionally, Comcast cites the testimony of the patents' inventor, Mr. Charles Norman, who stated that he referred to an "add/drop multiplexer" as a "ring terminal." (D.I. 265 at 294:15–21). Mr. Norman also confirmed that the patent provides examples of ADMs that were current at the time of filing, including: "Alcatel Models 1648SM, 1624SM, and 1612SM."[3] (Id. at 295:14–22; D.I. 291-1 at 4:54–58). Comcast also highlights the fact that several SONET platforms in the

---

[3] Dr. Willner identified the following as "add/drop multiplexers" in his initial expert report: "the Alcatel 1603 SMX; the Alcatel 1603 SM; the Fujitsu Flashwave 4100, 4300, 4500, and 7500; the Fujitsu Lightwave Multiplexer 150 and 2400; and the Nortel/Cienna Optical Metro 3500." (D.I. 291-3 at 8). I note that he also referred to these pieces of equipment as "network elements for adding/dropping SONET traffic." (Id.).

accused networks are specifically labeled as "ADMs," including the "FLM 150 ADM" and "FLM 2400 ADM."[4] (PTX657; PTX658). Comcast notes that Dr. Willner conceded that "you can certainly have a box that really only connects up to one ring, and would only be a ring terminal." (D.I. 266 at 672:3–5). Dr. Willner also admitted that there was nowhere in the patent or prosecution history that made any reference to interface cards as "ring terminals." (*Id.* at 672:21–673:7). Comcast points out that Sprint's own engineer, Mr. Michael Logan, confirmed that an "add/drop multiplexer" is "a box off the shelf" and "a card configurable solution." (D.I. 265 at 273:23–274:7). Further, Dr. Willner testified that an interface card is "part of a big box" that shares "a shelf" and "a power supply," and must be "plugged in[to]" a SONET platform in order to operate. (D.I. 266 at 639:23–640:1). While the overwhelming evidence supports the conclusion that SONET platforms in the accused networks are "ring terminals," this conclusion is unnecessary to find non-infringement as a matter of law. It is undisputed that a "common switch fabric" is required to perform "switching" and "grooming" in the representative platforms, and that the "switch fabric" is shared by all the rings that connect to a single platform. Thus, any combination of platform components that functions as a "ring terminal" must include a "common switch fabric" and be "shared" by all the rings connected to the platform. Therefore, it is immaterial whether the platform itself, or some subset of the platform, is operating as a "ring terminal." Either way, a single "network element" performs all the functions of a "ring terminal" and is "shared" among multiple rings.

Comcast argues that the accused networks in every region except Portland, San Francisco, and Seattle share SONET platforms, and thus have shared "ring terminals." (D.I. 290 at 18). Dr. Prucnal testified that there are "79 Comcast rings that have been accused and in 73 of

---

[4] I note that Dr. Willner used the FLM 2400 ADM as an "exemplary implementation" for his infringement analysis. (D.I. 299 at 13; D.I. 266 at 464:15–465:9).

14

them, my conclusion is that the Comcast ring shares a terminal with another ring." (D.I. 267 at 929:13–17). For the six rings without shared "ring terminals," Dr. Prucnal found that they did not have "a plurality of connections." (*Id.* at 930:22–931:3). Sprint does not dispute that seventy-three of the seventy-nine accused networks share SONET platforms.[5] (D.I. 299 at 18–19 & n.58). Thus, it is undisputed that SONET platforms in all the accused networks, except for those in Portland, San Francisco, and Seattle, are shared among multiple rings. It follows that the SONET platforms in these seventy-three networks perform the functions of a "ring terminal" for multiple rings, and thus are not "unique." Therefore, a reasonable jury could not have found infringement in any of these seventy-three networks. Comcast is therefore entitled to judgment as a matter of law of non-infringement with respect to each of the asserted claims for all the accused networks, except for the six accused networks in Portland, San Francisco, and Seattle.

### c. Whether the Accused Portland, San Francisco, and Seattle Networks Have a "Plurality of Connections" and "Connection System[s]"

Comcast concedes that the six accused networks in Portland, San Francisco, and Seattle do not share SONET platforms, and thus have "unique ring terminals."[6] (D.I. 290 at 21). Comcast argues that Sprint's infringement claim still fails for these six networks, however, because they are not "interconnected" in the manner required by the asserted claims. (*Id.*). Claim 1 of the '605 patent requires "a plurality of connections between the rings that are operational to provide interconnectivity among the rings." (D.I. 291-1 at 8:47–49). Claims 1 and 7 of the '339 patent require "a connection system coupled to the first SONET ring and to the second SONET ring configured to groom SONET traffic," while claims 17 and 22 require a "first connection system" and "second connection system" both "coupled to the first SONET

---

[5] Sprint also appears to concede that Seattle networks 1 and 2 share the same ONS 15454 platform, but I will address this in the next subsection. (D.I. 299 at 19; D.I. 266 at 536:14–537:11).
[6] Networks 1 and 2, in each region, are accused. (D.I. 266 at 438:4–14, 594:13–17 & 600:6–8).

ring and to the second SONET ring configured to groom SONET traffic." (D.I. 291-2 at 8:48–50 & 10:1–7). Comcast notes that Dr. Willner testified that "direct connections" exist in the accused networks in Boston, Denver, and Philadelphia, and that "DCS connections" exist in the accused networks in Boston, Chicago, Portland, and San Francisco. (D.I. 267 at 539:1–15). Dr. Willner did not identify direct or DCS connections in Seattle, but testified that the accused Seattle networks have a "switching functionality." (*Id.* at 539:16–17).

Comcast argues that the evidence presented at trial proves that the DCS connections in Portland and San Francisco do not connect one SONET ring to another. (D.I. 290 at 22). Comcast relies on the testimony of its engineer, Mr. Johnson, who stated that the "digital cross-connect system" (DCS) in Chicago networks 1 and 2 does not provide "interconnection" between the two networks, but rather "connect[s] the Flashwave 4500 to our TDM [time-division multiplexing] to IP gateways." (D.I. 267 at 891:1–14). Comcast also cites its response to Sprint's Interrogatory 10 for the accused networks in Portland, San Francisco, and Seattle, which states that "[n]o traffic on these circuits runs from one SONET network to a DCS to another Comcast SONET network." (PTX102 pp. 51–58). Comcast's response to Sprint's Interrogatory 10 also provides that in the accused San Francisco networks "[n]o traffic travels or traveled from one of these OC-192 networks to the other." (PTX102 at p. 56). Thus, Dr. Prucnal concluded that the accused rings in Portland, San Francisco, and Seattle are "not connected," and that "a plurality of connections were not present in the six rings." (D.I. 267 at 1008:4–18 & 1009:1–5). Dr. Prucnal also concluded that for these six rings "there is not a connection system coupled to the first SONET ring and to the second SONET ring." (*Id.* at 1010:1–22).

Sprint, on the other hand, argues that Dr. Willner identified DCS connections in the accused San Francisco and Portland networks, which meet the "plurality of connections" and

"connection system[s]" limitations of the asserted claims. (D.I. 299 at 17). Sprint notes that Dr. Willner explained that a "DCS connection" is a "digital cross-connect system," which is used "to cross connect inputs and outputs." (D.I. 266 at 525:10–21). Further, Sprint cites the testimony of Comcast's employee, Mr. Robert Rockell, who explained that the DCS in one of the representative Boston networks is "performing a cross-connect function of some kind." (D.I. 265 at 316:20–317:12). Mr. Rockell explained that a cross-connect function "is where you take a circuit and connect it to another circuit and to another path." (*Id.* at 317:15–17). Relying on network diagrams provided by Comcast, Dr. Willner explained that in the accused Portland networks there are two rings and "a connection system that's connecting . . . this unique ring terminal here and the unique terminal ring here." (D.I. 266 at 560:21–561:5; PTX703). Dr. Willner also explained that in the accused San Francisco networks "the unique ring terminals for the different networks are connected to" a "digital cross-connect," which "allows for a connection between the different rings." (D.I. 266 at 561:24–562:8; PTX676). Further, Dr. Willner identified "connection systems" at seven of the SONET platform locations in San Francisco networks 1 and 2. (D.I. 266 at 579:4–10). Thus, Sprint presented sufficient evidence for a reasonable jury to find that the accused Portland and San Francisco networks have a "plurality of connections" and "connection system[s]."

Sprint also argues that a reasonable jury could have concluded that the accused Seattle networks are coupled to a "switching functionality," which meets the "plurality of connections" and "connection system[s]" limitations. (D.I. 299 at 18). Sprint notes that Dr. Willner identified a "switch matrix" in the ONS 15454 platform, which is used in the accused Seattle networks, explaining that the "switch matrix" allows "network operators to concentrate or groom low-speed traffic from line cards onto high-speed transport spans." (D.I. 266 at 536:14–537:11).

Sprint also points out that Dr. Willner identified "connection systems" at seven of the SONET platform locations in Seattle networks 1 and 2. (*Id.* at 579:18–580:4). By making this argument, however, Sprint concedes that the two Seattle rings share a SONET platform that performs all the functions of a "ring terminal." Under this theory, the accused Seattle networks would have shared "ring terminals," and thus would not infringe. Additionally, Dr. Willner did not identify direct or DCS connections in the accused Seattle networks, so the "switch matrix" is the only possible connection between the Seattle rings. Thus, Sprint's argument provides two possible conclusions for the accused Seattle networks: either they share "ring terminals," or they lack a "plurality of connections" and "connection system." Under either circumstance, a reasonable jury could not have found infringement in the accused Seattle networks. Therefore, Comcast is entitled to judgment as a matter of law of non-infringement with respect to each asserted claim for the two accused Seattle networks.

### d.    Whether the DCS Connections in the Accused Portland and San Francisco Networks Are "Operational to Provide Interconnectivity" and "Configured to Groom SONET Traffic"

Comcast also argues that Sprint has failed to prove that the "connections" in the accused networks, including those in Portland and San Francisco, are "operational to provide interconnectivity among the rings" and "configured to groom SONET traffic."[7] (D.I. 290 at 23). During cross, Dr. Willner admitted that he only knew how the accused Comcast equipment is "capable of operating," not how it "actually operated." (D.I. 266 at 619:3–620:1). Dr. Willner explained that the asserted claims are "apparatus claim[s]," so an accused network only "has to be capable of doing things," and it "doesn't have to actually be in use to do that." (*Id.* at 619:3–14). The Federal Circuit has held, however, that being "capable of infringing" does not prove

---

[7] Comcast argues that Sprint has failed to prove these claim limitations for all seventy-nine accused networks. I have already found, however, that Sprint failed to prove infringement for seventy-five of the accused networks. Thus, I will focus this section on the four remaining accused networks in Portland and San Francisco.

infringement *per se* because "in every infringement analysis, the language of the claims, as well as the nature of the accused product, dictates whether an infringement has occurred." *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002). The Federal Circuit has also held that when "[t]he claim language clearly specifies a particular configuration," proving an accused product is "reasonably capable of being put into the claimed configuration is insufficient for a finding of infringement." *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 994–95 (Fed. Cir. 2009). Further, the Federal Circuit stated that in such a circumstance, "infringement requires specific instances of direct infringement or that the accused device necessarily infringes the patent in suit." *Id.* at 995 (internal quotation marks omitted). In *Ball*, the Federal Circuit reversed the district court's finding of infringement, determining that summary judgment of non-infringement was appropriate, because plaintiff failed to prove that the accused product "was ever placed in the infringing configuration," and that the accused product did "not necessarily have to be placed in the infringing configuration." *Id.*

Here, the asserted claims require "connections" that are "operational to provide interconnectivity," and at least one "connection system" that is "configured to groom SONET traffic." Sprint provided no evidence of the actual "operation" or "configuration" of the DCS connections in Portland and San Francisco. Dr. Willner conceded that he did not know how the accused networks "actually operate," and thus could not have reasonably testified as to whether the DCS connections in Portland and San Francisco are "operational to provide interconnectivity" or "configured to groom SONET traffic." Dr. Willner's testimony about the DCS connections in Portland and San Francisco, therefore, is not legally sufficient to sustain a finding of infringement. *See id.* at 994–95. Additionally, the evidence makes clear that digital

cross-connect systems do not necessarily have to be "operational" or "configured" in a manner that meets the claim limitations. For example, Comcast's engineer explained that the DCS in Chicago networks 1 and 2 connects the networks to third parties or IP gateways, and does not provide "interconnection" between the accused rings. Further, Comcast's interrogatory response clearly states that "[n]o traffic . . . runs from one SONET network to a DCS to another Comcast SONET network" in the accused Portland and San Francisco networks. Thus, Sprint has failed to present evidence establishing that these DCS connections are "operational to provide interconnectivity" or "configured to groom SONET traffic." It follows that a reasonable jury could not have found infringement in the accused Portland and San Francisco networks.[8] Therefore, Comcast is entitled to judgment as a matter of law of non-infringement for each of the asserted claims for the four accused networks in Portland and San Francisco.

### e.    Conclusion

In sum, Sprint's infringement claims fail as a matter of law in all seventy-nine accused networks. Seventy-three of the accused networks share SONET platforms that perform all the functions of a "ring terminal," and thus do not have "unique ring terminals." The two accused Seattle networks do not have "direct" or "DCS" connections, and the two networks could only be connected by a "common switch fabric" in a shared SONET platform. Thus, the two accused Seattle networks either lack a "plurality of connections" and "connection system," or do not have "unique ring terminals." Sprint failed to present evidence that the DCS connections between the four accused networks in Portland and San Francisco are actually "operational to provide interconnectivity" or "configured to groom SONET traffic." Thus, a reasonable jury could not have found infringement for any of the seventy-nine accused networks. Therefore, Comcast is

---

[8] Sprint does not make a "switching functionality" argument for the accused Portland and San Francisco networks, as it did for the accused Seattle networks. *See infra* pp. 17–18. This argument, nevertheless, would fail for the same reasons provided for the accused Seattle networks.

entitled to judgment as a matter of law of non-infringement with respect to each of the asserted claims for all seventy-nine accused networks.

## B.    Comcast's Motion for a New Trial

In the alternative, Comcast moves for a new trial on the issue of infringement.[9] (D.I. 289). As stated above, I will address Comcast's argument that Sprint urged the jury to disregard the Court's claim constructions during closing as an argument for a new trial. (D.I. 290 at 11). Comcast also argues that it was unfairly prejudiced by Sprint's trial presentation because: (1) Sprint presented a novel infringement theory based on undisclosed expert opinions; and (2) Comcast was precluded from presenting evidence of a prior art reference that was relevant to its non-infringement theory. (*Id.* at 28).

### 1.    Misleading Statements to Jury

Comcast argues that Sprint misled the jury by making arguments during closing that contradicted the Court's claim constructions. (*Id.* at 11). Comcast highlights that the Court construed the term "ring terminal" as performing the required functions "on the connected SONET spans," and the term "span" as "the logical connection between ring terminals." (D.I. 119 at 2). Comcast also points out that the Court construed the term "[SONET] ring" as "a self-healing SONET architecture connecting ring terminals in a loop in which each ring terminal in the loop is directly connected only to the adjacent ring terminal(s) in each direction around the loop." (*Id.*). Comcast argues that, according to these constructions, "each 'ring terminal' must connect to one span *in each direction* around the ring." (D.I. 290 at 12). Comcast contends that Sprint contradicted these constructions in closing by telling the jury that the asserted claims do not require "ring terminals" to "receive and transmit in both directions around a ring." (D.I. 268

---

[9] During oral argument, Comcast withdrew its argument that the Court improperly excluded testimony from Comcast's damages expert regarding comparable license agreements. (D.I. 313 at 23:24–24:4).

at 1231:1–1232:7). Sprint further stated that Comcast's argument that "ring terminals" must connect in "both directions" around a ring is not "relevant" because it is "for purposes of establishing whether it's self-healing, not infringement." (*Id.* at 1233:17–20). Comcast argues that by making these statements, Sprint "invite[d] the jury to find infringement on a theory that is contrary to the proper construction of the asserted claim[s]." *See Creative Internet Advert. Corp. v. Yahoo!, Inc.*, 476 F. App'x 724, 729 (Fed. Cir. 2011).[10]

Sprint, on the other hand, argues that Comcast waived its right to seek a new trial by failing to object to Sprint's statements at trial. (D.I. 299 at 22). The Third Circuit has held that "[c]ounsel's failure to object precludes him from seeking a new trial on the grounds of the impropriety of opposing counsel's closing remarks." *Murray v. Fairbanks Morse*, 610 F.2d 149, 152 (3d Cir. 1979). Comcast contends, however, that it objected at trial to Sprint's position that the Court's claim constructions do not require "ring terminals" to connect in both directions around a ring. (D.I. 307 at 16). During Sprint's objection to evidence relating to Comcast's "both directions" theory, Sprint stated that "there's no requirement in the claim that [a 'ring terminal'] both sends and receives," and that the Court's "claim construction says nothing about both directions at all." (D.I. 267 at 735:12–736:1). Comcast objected to Sprint's transcription of the Court's construction of "ring terminal," noting that Sprint incorrectly used the singular "span" rather than the plural "spans" for the phrase "on the connected SONET spans." (*Id.* at 736:2–17). Sprint admitted that this error was "unintentional." (*Id.* at 736:14). Comcast did not object to the substance of Sprint's argument, however. It merely corrected Sprint's transcription of the Court's construction of "ring terminal." This does not constitute an objection to Sprint's

---

[10] In *Creative Internet*, the Federal Circuit found that the district court "erred in leaving a central question of claim construction to the jury over [appellant's] objection." *Creative Internet*, 476 F. App'x at 728. The Federal Circuit held that appellant did not waive its right to challenge the district court's claim construction "[b]ecause the jury may have found infringement based on [appellee's] broader and incorrect theory of claim construction." *Id.* at 729.

statements during closing. Had Comcast objected to Sprint's statements during or immediately after closing, I could have resolved the issue then. Instead, Comcast chose not to object. Therefore, Comcast waived its right to seek a new trial on the basis of Sprint's statements during closing.

## 2. Sprint's Infringement Theory

Comcast also argues that Sprint relied on undisclosed expert opinions and presented a new infringement theory at trial. (D.I. 290 at 28). Sprint, however, contends that Comcast waived its right to seek a new trial because it did not object to Dr. Willner's testimony during trial. (D.I. 299 at 29). Comcast maintains that it did not waive its objection because it filed a pretrial motion *in limine* objecting to Dr. Willner's testimony, and that this objection is preserved because the Court did not rule on the motion. (D.I. 307 at 15). The Third Circuit has held that "when an argument is raised in support of a motion *in limine*, but the court *reserves* disposition of the motion and never decides it. . . . [C]ounsel reasonably may conclude that the court has the motion under continuous advisement and that it need not be restated." *Repola v. Morbark Indus., Inc.*, 934 F.2d 483, 488 (3d Cir. 1991). In Comcast's motion *in limine*, Comcast argued that Dr. Willner's testimony that a single interface card is a "ring terminal" was impermissible under Rule 26 of the Federal Rules of Civil Procedure because it was not disclosed in his expert reports. (D.I. 237-7 at 17). I did not rule on this motion prior to trial, and thus Comcast's objection to Dr. Willner's testimony is preserved.

Sprint also claims that it has consistently argued that "one or more interface cards within the accused SONET platforms are the unique ring terminals," and that they "include an ADM and are capable of receiving, switching, grooming, and transmitting SONET traffic." (D.I. 299 at 11). In Sprint's answering brief to Comcast's motion for summary judgment, Sprint made

clear that Dr. Willner "opines that the physically distinct interface cards contained within each of the various SONET platforms constitute unique 'ring terminals,' as construed by the Court."[11] (D.I. 193 at 14). During oral argument on Comcast's motion for summary judgment, I asked Sprint, "[I]s the ring terminal the interface card or is it something beyond the interface card?," and Sprint responded, "It really boils down to the interface card." (D.I. 239 at 76:11–14). Sprint further stated that "[t]here's a basic functionality in the Court's claim construction that the card performs, and then in conjunction with other cards," noting that "[y]ou can have a couple of cards working together in these platforms and they perform [receiving, switching, grooming, and transmitting]." (*Id.* at 76:17–25). Based on these statements, and Dr. Willner's reply report, I found that there was a genuine issue of material fact "as to whether an 'interface card' constitutes a 'ring terminal.'" (D.I. 252 at 3).

At trial, Sprint presented a slide in its opening that assured the jury that Sprint would prove that a single interface card is a "unique ring terminal" that includes an add/drop multiplexer, and receives, switches, grooms, and transmits SONET traffic. (D.I. 290 at 31; D.I. 265 at 197:2–21). Sprint stated, "This is one example of an interface card, these little unique ring terminals." (D.I. 265 at 197:2–4). On direct, Dr. Willner identified a single "OC-12 plug-in unit" as "the ring terminal," explaining that it is "an add/drop mux, which is capable of grooming, switching, transmitting, [and] receiving." (D.I. 266 at 458:24–459:6). During cross, however, Dr. Willner was asked whether an individual interface card satisfies the Court's construction of "ring terminal," and he responded, "I can't answer that as a yes or no." (*Id.* at 636:21–637:1). Dr. Willner explained that he had "identified instances where it could be a single

---

[11] In his reply report, Dr. Willner stated that: "In many cases, transmitting, receiving, grooming, and switching SONET traffic occurs on interface cards," noting that "certain functionalities (e.g., grooming and/or switching SONET traffic) may occur across multiple cards and/or cards in conjunction with other elements." (D.I. 176-8 at 4). Further, Dr. Willner identified the "ring terminals" in the accused networks as interface cards "in conjunction with other element(s)." (*Id.*).

24

card, where it could be multiple cards, where it could be a portion of a card." (*Id.* at 635:12–16). When asked again about a single interface card, Dr. Willner stated that "you can design a network that has a transmitter and a receiver on it," so that the individual card "can be in isolation," and "can take in traffic from the left and send it out to the right on the ring." (*Id.* at 644:9–21). Dr. Willner further clarified his testimony, explaining that "outside of the network itself, if I just looked at that card, that card . . . is an ADM that's capable of receiving, transmitting, switching and grooming." (*Id.* at 645:6–10).

During oral argument on Comcast's post-trial motions, however, Sprint conceded that "[f]or the accused products, a single interface card is not the ring terminal and was never argued to be the ring terminal." (D.I. 313 at 92:11–14). This statement seems to be in direct conflict with Sprint's arguments at summary judgment and Dr. Willner's testimony at trial. Dr. Willner stated on multiple occasions that a single interface card could perform all the functions of a "ring terminal." Further, he identified a single "OC-12 plug-in unit" as "the ring terminal" in a representative platform. Thus, I am dubious of Sprint's claim that a single interface card "was never argued to be the ring terminal." In light of Dr. Willner's testimony at trial, Comcast argued that a single interface card could not be a "ring terminal" because it cannot connect to "spans" "in each direction" around a SONET ring. During closing, Sprint argued that the asserted claims do not require a "ring terminal" to send and receive traffic in "both directions." (D.I. 268 at 1231:1–1232:7). Sprint made this argument in support of its theory that a single interface card could be a "ring terminal," but Sprint has now conceded that this theory is incorrect. Thus, Sprint presented an incorrect infringement theory to the jury, which may have "unfairly influenced the verdict." Therefore, allowing the verdict to stand would result in "a miscarriage of justice." It follows that Comcast is entitled to a new trial on the issue of infringement.

### 3. Exclusion of Sandesara Patent

Comcast argues that it was unfairly precluded from presenting evidence of U.S. Patent No. 5,327,427 (the "Sandesara patent") at trial. (D.I. 290 at 33). During cross, Comcast asked Dr. Willner to "[d]efine shared ring terminal for the jury," and Dr. Willner replied that the earlier issued Sandesara patent provides an example of a "shared ring terminal." (D.I. 266 at 628:7–629:7). Dr. Willner explained that "Sandesara had a box that was called a cross-connect node where two rings were coming into this box, this cross-connect. . . . And the grooming and switching was being done from the traffic of both the rings, and not uniquely." (*Id.* at 628:20–629:2). Dr. Willner stated that Mr. Norman distinguished the '605 and '339 patents from the Sandesara patent by requiring the "ring terminals" in the asserted claims to be "unique" and "not share[d]." (*Id.* at 628:20–629:5). Based on Dr. Willner's testimony, Comcast planned to introduce the Sandesara patent and testimony from its own expert, Dr. Prucnal, regarding the meaning of "shared ring terminal." Sprint timely objected, arguing that Comcast was asking the jury to construe the claims in light of prior art. (D.I. 267 at 746:3–12). To resolve Sprint's objection, I struck the prosecution history, including the Sandesara patent, prohibited any further reference by Sprint to Dr. Willner's testimony regarding the Sandesara patent, and precluded Comcast from eliciting testimony about the Sandesara patent. (*Id.* at 750:4–12). Both parties followed my instructions for the remainder of trial.

Comcast argues that it should have been permitted to introduce the Sandesara patent at trial because Dr. Willner chose to define "shared ring terminal" by reference to the Sandesara patent. (D.I. 290 at 34). Comcast, however, asked Dr. Willner to construe this term. It is well settled that "the interpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law exclusively for the court." *Markman v.*

*Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

Comcast attempted to have the jury, rather than the Court, construe the claim terms "unique" and "not share[d]" by asking Dr. Willner to construe the term "shared ring terminal." Having Sprint's expert impermissibly construe "shared ring terminal," however, did not give Comcast the right to do the same. Therefore, the Sandesara patent and any testimony relating to the Sandesara patent were properly excluded, and my decision to exclude this evidence is not grounds for a new trial.

## IV. CONCLUSION

For the reasons set forth above, Comcast's motion for JMOL is granted with respect to non-infringement of all the asserted claims for every accused network. In the alternative, Comcast's motion for a new trial is granted on the issue of infringement. In light of the present decision, Sprint's motion for prejudgment and post-judgment interest is dismissed as moot. An appropriate order will be entered.